Booth, Judge,
delivered the opinion of the court:
The plaintiff, an express company organized under the laws of Delaware and engaged in the usual transportation business of express companies, sues to recover $53,818.78 deducted by the General Accounting Office from sums admittedly due it for transportation service furnished the defendant subsequent to this transaction.
A general resume of the facts is sufficient for this opinion. The details of the case appear from the stipulated findings, and we need not repeat them. December 23, 1920, the plaintiff company accepted for transportation from the Treasurer of the United States three packages of currency aggregating the total sum of $120,000. One package contained $8,000, one $40,000, and one $72,000, each being consigned to Lieut. W. A. Buck, S. C., United States Navy, U. S. S. Satterlee, United States navy yard, Norfolk, Ya., the shipment being made on Government bill of lading No. T-268103. The packages reached Portsmouth, Ya., in the early morning of December 27,1920, and were turned over by the agent of the company at that place to one George Howell, a money clerk and messenger of the plaintiff company, for final transportation and delivery to the consignee, two armed guards in the employ of the company accompanying its messenger. Somewhere near 10 o’clock a. m. of the same day Howell and the armed guards went aboard the Satterlee, came in contact with one McBride, a third-class yeoman, and were by him informed that Lieutenant Buck was not aboard ship.
A messenger was thereupon dispatched to locate Hal W. J. Meyer, another third-class yeoman, and by the findings stipulated as assistant to Lieutenant Buck. Meyer stated to Howell that he was Buck’s assistant, that he would receive and sign for the money and deliver the same to the lieutenant as soon as he came on board. He! further said *630 that he was accustomed to signing receipts for money shipments and had two safes wherein he could keep the amounts. Howell declined at first to deliver the packages to Meyer. Instead he called up the chief clerk of the Portsmouth office of the company and informed him over the telephone that Buck was not on board the ship and would not return until about 11 o’clock, and asked for instructions as to making-delivery to Meyer. The chief clerk advised Howell to make the delivery if he could obtain a good signature. Howell thereupon, informed the chief clerk that Buck’s assistant paymaster yeoman, Pial W. J. Meyer, was on board ship, ", ould sign for and receive the money, and deliver the same to Buck upon his return to the ship. The chief clerk then directed Howell to obtain Meyer’s signature and deliver the packages to him. Howell asked Meyer for the surrender of the accomplished bill of lading. Meyer, after an examination of the papers on the desk in the office, was unable to find the bill of lading, whereupon Howell obtained Meyer’s signature to his waybill book receipt and delivered the packages to him, Meyer at the time preparing a memorandum requesting Lieutenant Buck to fill out and return to the company by mail the accomplished bill of lading. This paper Plowell left with Meyer.
The three packages of currency were then placed by Meyer on the desk of Paymaster Buck in his office on board ship and the door locked, Meyer having possession of and retaining the key. Howell, previous to this transaction, had never accepted the signature of an enlisted man in the Navy for money consigned to a commissioned officer. About noon of this same day Chief Yeoman C. W. Tait, senior assistant to Lieutenant Buck, returned to duty aboard ship. Upon going to ship’s office he found Meyer, who immediately informed him of the delivery of the money. Tait and Meyer then went directly to the paymaster’s office; Tait checked np the figures on the outside of the packages, found the seals intact, and the aggregate amount of the shipment to be $120,000. Tait then instructed Meyer to lock the door, saw that his orders had been obeyed, and, allowing Meyer to retain the key, the two men left the vicinity of the office.
*631 Without going further into minute detail it is sufficient to state that at some hour between noon and 4 p. m. of this same day Meyer and two confederates, Brennan and Ash-more, procured shore-leave permits by means of forged orders, left the ship, taking with them one of the packages involved, which contained $72,000 in currency. The, theft was discovered by Lieutenant Buck shortly after his return aboard ship, the loss duly reported, and afterwards officially investigated by a Navy board. Meyer, Brennan, and Ash-more were subsequently apprehended, indicted, plead guilty, and were sentenced to prison. Of the amount stolen $18,000 was recovered, and to this must be added the sum of $181.22, salvage value of an automobile purchased by the culprits and seized at the time of their arrest, leaving the balance sued for in this case.
The argument advanced by the plaintiff to sustain the right of recovery is predicated upon three propositions of law: First, it is contended that there was in law a delivery of the shipment; second, the loss of the currency was due to the negligence and criminality of defendant’s agents, and, lastly, in any event, the defendant is barred from asserting a claim for the loss because of failure to make a claim therefor in writing within the four months’ period prescribed in the uniform express receipt, filed with the Interstate Commerce Commission, and published and posted as required by law. If the plaintiff company accomplished a lawful delivery of the shipment involved, obviously the controversy is at an end. The obligation of the plaintiff was to safely transport and deliver to the consignee the currency entrusted to its care, in accord with the contract so to do. This shipment was made on Government bill of lading No. T-268103. It is so stipulated in the findings. "To this instrument, and to it alone, may we look for the terms of the contract governing the transaction, an indisputable fact, made manifest not only from the terms of the bill itself but familiar in all its details to the agents of the plaintiff company, who were fully cognizant of the fact that Government property is uniformly and invariably transported upon a Government bill of lading, which is first executed by the plaintiff’s agent, then re *632 turned to the shipping officer and by him forwarded to the consignee, who, upon delivery, surrenders the same to the carrier, constituting as a finality the basis of payment to the carrier of its transportation charges. By the express terms of the bill of lading the stolen package of currency was consigned to Lieut. W. A. Buck.
The place of delivery was on board the U. S. S. Scotterlee, navy yard, Norfolk, Ya. The package arrived safely at the place of delivery, but admittedly it was not delivered to the consignee. Was it then delivered to anyone clothed with authority to receive and receipt for the same in the temporary absence of the consignee ? There is not an official word in the stipulation of facts disclosing authority upon the part of Meyer to accept and receipt for currency consigned to the paymaster. True, Meyer verbally proclaimed authority, but responsibility for the acts of Government officers and agents is not fixed by oral statements or from appearances. It is conferred by law. The mere fact of appointment as an assistant to a paymaster does not carry with it authority to receipt for and accept delivery of large sums of money consigned to the paymaster individually. The duties of an assistant may cover a variety of acts perfectly consistent with a denial of a right to receive money for the paymaster. The primary question upon this phase of the case is one not subject to speculation or inference. It must be proven positively, and the burden of proof rests upon the plaintiff. Not only has the plaintiff signally failed in this respect, but the record shows a positive lack of authority to so act.
Paragraph 137 of the Manual for Supply Officers Afloat, Navy, 1917, provides:
“ Signatures by yeomen.' — No yeoman shall sign an official paper for any officer of the Pay Corps.”
"When a Government bill of lading names a consignee without qualification and the subject matter of the shipment is a most substantial sum of Government funds, the obligation of the transportation company to deliver the shipment to the named consignee is not discharged by delivering the shipment to another, unless it is shown beyond dispute that by authority of law or the regulations the third party was *633 clothed with authority to accept the same. In this case no such proof obtains, and citations of precedents to sustain the rule of law is not required. It is too well established and too familiar to exact them. The court is powerless to deduce from the proven facts a lawful delivery in the present instance.
The fact that the packages of money were to be delivered to the consignee on board a ship of war, anchored at the wharf of a United States navy yard, a place and a vessel under strict surveillance, and those in charge under rigid discipline, does not help the plaintiff’s cause. Obviously the plaintiff company, and beyond doubt its money messenger Howell, knew the exact status of affairs, and were fully aware that the officers and men on board ship and in the navy yard act under orders and commands; that noncom-missioned officers were subordinate officials with limited authority and prescribed duties; that under the law and naval regulations the status of the officers and men aboard ship is fixed and determined, and that beyond the limits so fixed they may not go with authority. This the plaintiff knew, for the money messenger was admonished to secure a good, signature. It is vastly different from the .delivery of money to an agent of a national bank, authorized to receive deposits and credit the same on the books of the bank, or a shipment of packages other than money to a named department of the Government. The mere possession of the packages here concerned by a noncommissioned officer or officers of the ship, even though they actually are assistants to the consignee, does not relieve the plaintiff from the necessity of showing that as such assistants they had authority to accept and receipt for money consigned to their superior. A paymaster in the Navy assumes grave responsibilities ; he is a bonded officer and subject at all times to account for every penny of funds reaching his custody. Large amounts are annually transmitted to him by the Treasury Department and by him carefully disbursed.. To hold that the sum of $120,000 was lawfully delivered to him, as consignee for that amount, by making delivery thereof to his office aboard ship, or to a subordinate official in his absence. *634 upon the basis usually applied to the delivery of ordinary commercial shipments, would be contrary to precedent and at variance with established law. The plaintiff failed to observe the plain terms of the bill of lading respecting delivery. No receipt was exacted of the assistant receiving the money certifying his authority to so act; nor any recitation of from whom or under what law or regulation he was assuming to act. Again, in the absence of the bill of lading, only the consignee may give the carrier a receipt for the property actually delivered, and this receipt must state upon its face that it is given because the bill of lading has not come to hand.
As to the second contention, the negligence and criminality of the defendant’s agents and officers causing the loss, it is pertinent to say that for acts of this character by a Government agent, manifestly no liability attaches to the Government. The record does disclose a most amazing degree of carelessness and an utter and inexcusable lack of diligence, not attributable, at least in the first instance, to the Government but to the plaintiff. Ey what process of reasoning an experienced agent of the plaintiff company could bring himself to rest content with the delivery of $120,000 in currency to a third-class yeoman on board a naval vessel, in the absence of the consignee, is manifestly enigmatical. Howell,, the messenger, knew better and refused to act without specific authority from his superior. The company knew the value of the shipment, the responsibility of the carrier, and the incident danger of the theft in making delivery. Commendable steps, precautionary steps, were taken to prevent robberjr and theft up until the moment, in the presence of the-messenger and armed guards, the money itself was voluntarily delivered into the possession of one of the very men who afterwards stole it. Not a single commissioned officer was consulted, the commander of the ship ignored, absolutely no effort was made to ascertain the truth of Meyer’s statements, no, inclination to await the consignee’s return evinced, no movement toward taking the money back to., Portsmouth, not a single word uttered or act performed in consonance with the degree of prudence and care required-. *635 under the exceptional circumstances. Surely in view of the facts it is not to be held that the officers on board ship were careless and negligent in not effectively guarding against forgery and theft when knowledge of the presence of a large sum of money, carelessly lying on the desk in the paymaster’s office, was known to but three third-class yeomen, and by them not communicated to their superior officers. The plaintiff put it within the power of Meyer to conceive the conspiracy to steal the money, and in this particular may not escape responsibility by asserting a lack of diligence subsequent to the event, when a prior exercise of caution and care upon its part would have enabled it to escape liability and discharge its contractual obligations according to the terms and conditions of the contract. If the case were resolvable upon the issue of negligence the defendant would be absolved.
We may not, however, entertain a contention of governmental liability for the loss of a package of money delivered to an agent of the Government unauthorized to receive it on the theory that notwithstanding the agent’s lack of authority the money was lost through the negligence and criminality of the Government’s officers. (Bigpy v. United States, 188 U. S. 400.) To this class of injuries our jurisdiction does not extend. The issue here is not so much to fix blame for the loss as to ascertain who was legally responsible for the package of currency from the time it left the treasurer’s office until it was stolen from the office of the paymaster.
The third and final insistence of the plaintiff raises again the question as to the binding effect on the United States of a stipulation in a bill of lading prescribing limitation upon the right of the Government to sue for loss of a shipment irrespective of the responsibility for the loss. In other words, may an officer or agent of the United States, in the absence of statutory authority so to do, assent in its behalf to a limitation of the Government’s right to assert its claims in court? In this case the defendant did not sue the plaintiff; nor was a formal claim in writing filed with the plaintiff within four months after a reasonable time for *636 delivery had elapsed, as the bill of lading provided. What the defendant did was to apply funds in its hands then due the plaintiff in extinguishment of this alleged debt.
The plaintiff company did, as the findings show, receive timely and immediate notice of the loss of the money, and its principal officers and legal representatives were present at and during the investigation of the event by the naval board. The plaintiff’s employees concerned in the matter were examined as witnesses by the board and nothing was left undone to bring home to the plaintiff company the circumstances of the loss, except the omission to supplement the initiatory proceedings with the formal notice exacted by the terms of the bill of lading. In view of this situation, the issue now under discussion narrows to the technical extent of contending that, notwithstanding immediate notice of the loss and full knowledge of all that happened, the Government was obligated to go still further and file the written notice of claim. The loss occurred on December 27, 1920. The following morning, after notice, a conference was held in which representatives of the plaintiff participated. On December 28, 29, and 30 the naval board conducted its investigation, the plaintiff’s representatives, as before observed, being present and participating in the proceedings until the close thereof, in possession of actual knowledge at all times and under all circumstances of just what occurred. Subsequently the plaintiff accomplished a large volume of transportation, for which undisputed payments were withheld, and not even inquired about by the plaintiff until August, 1921, nine months after this loss. Assuredly the plaintiff must have known that something was in the way of immediate settlements for the service rendered; that some adverse claim retarded payments; that some demand was being asserted by the defendant. As a practical question, it is seemingly indisputable that an experienced business agency would permit the accumulation of over $53,000 of overdue charges, under the circumstances of this case, without entertaining a thought and actual knowledge that the defendant was claiming some set-off, some counterclaim.
*637 It is difficult to believe, in the face of the record, that the plaintiff company was by the defendant led to believe that the claim for this loss was abandoned by the defendant when large and undisputed charges were almost without intermission accumulating in the hands of the defendant and withheld from the plaintiff. To require the defendant to give a more specific notice or claim, or acquaint the plaintiff more definitely with its claim, is in effect to hold it to an observance of a formality which functions only as cumulative evidence of its intent and a meaningless proceeding when actual notice and personal acquaintance and participation in the investigation of facts contemporaneous with the event obtained. The purpose subserved by the requirement of a written notice of claim had been and was fully met.
This court on June 14, 1926, in cases No. E-226, Atlantic Coast Line B. B. v. United States, ante, p. 449, and No. D-750, Missouri-Kansas-Texas- R. R. v. United States, ante, p. 373, adjudicated contentions in point with the plaintiff’s contention with respect to this issue. In the latter case Chief Justice Campbell, speaking fop the court, said:
“ There is a broader ground for rejecting the plaintiff’s contention to be found in the fact that it leads to a limitation upon the rights of the sovereign not authorized by statute. Unquestionably the rule is that it requires congressional action clearly manifesting such a purpose before the United States can be bound by statutes of limitations. See United States v. Nashville Ry. Co., 118 U. S. 120, 125. It is said that ‘ No laches can be imputed to the Government, and against it no time runs so as to bar its rights.’ See Thompson case, 98 U. S. 486, 488. The rule is not confined to statutes of limitations. In Kirkpatrick's case, 9 Wheat. 720, 735, Mr. Justice Story, speaking for the court, says: ‘ The general principle is that laches is not imputable to the Government; and this maxim is not founded in the notion of extraordinary prerogative, but upon a great public policy. The Government can transact its business only through its agents, and its fiscal operations are so various and its agencies so numerous and scattered that the utmost vigilance would not save the public from the most serious losses if the doctrine of laches can be applied to its transactions.’ See United States v. American Bell Telephone Co., 159 U. S. 548, 554. If it be conceded that the Government is bound by its contracts it must appear, in view of the authorities *638 cited, that there is statutory authority for. the particular contract as well as an authority in the agent who makes it to waive rights of the Government. There is an absence of these things in the instant case. The transportation act furnishes no basis for the contention that the Government is bound by the provisions of the uniform commercial bill of lading, and the implications to be found in that act tend rather to exclude Government shipments from its operation. We have quite recently adopted the view urged upon the court by counsel for transportation companies that the statute of limitations therein prescribed for actions by the carriers does not apply to suits by them in the Court of Claims. See Southern Pacific Co. case, No. D-504, decided this date.” See also E. I. Dupont De Nemours & Co. v. Davis, etc., 264 U. S. 456, 462.
The petition should be dismissed. And it is so ordered.
Moss, Judge; Gbaham, Judge; Hat, Judge; and. Campbell, Ghief Justice, concur.